IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER TURNER, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>AFFINITY HEALTH SERVICES, LLC<br><br>*Defendant* | Case No.  2:24-cv-439 |

## CLASS ACTION COMPLAINT

Plaintiff, JENNIFER TURNER, (hereinafter, "Plaintiff"), individually and on behalf of all others similarly situated, for her causes of action against Defendant, AFFINITY HEALTH SERVICES ("Defendant" or "AHS"), alleges upon personal knowledge as to her own actions, and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      On or around April 24, 2023, Affinity Health Services lost control over its patients', employees,' and affiliates of patients and employees' highly sensitive personal and medical information to cybercriminals (the "Data Breach").  AHS did not announce the Data Breach until nearly seven months later, leaving Plaintiff and the Class Members vulnerable to the risk of identity theft and fraud and without any means to mitigate it for months.

2.      AHS, headquartered in Indiana, Pennsylvania, is a management and consulting company for senior living communities in multiple states.  According to its

website, AHS was founded over twenty-five years ago and provides a continuum of services.[1] AHS states it is "dedicated to improving the lives of our seniors."[2]

3.　　On or about April 24, 2023, AHS "experienced a network security incident."[3] According to AHS, an unauthorized third party may have accessed certain individuals' personal information, which included first name, last name, address, Social Security number, date of birth, driver license's number, medical record number, patient ID number, Medicare/Medicaid number, financial account information or credit and debit card numbers, certain health information, and health insurance information.[4]

4.　　The affected files contained the confidential personal identifying information ("PII") and/or personal health information ("PHI") (together "Personal Information") of Plaintiff and members of the Class.

5.　　The victims of the Data Breach include current and former patients, employees, and affiliates of patients and employees of senior living communities for which AHS contracted to provide management services.

6.　　Upon information and belief, AHS was aware of the Data Breach for approximately seven months before it posted notice of the Data Breach on its Website and almost eight months before mailing letters to victims affected by the Data Breach.

---

[1] https://affinityhealthservices.net/# (last accessed Mar. 21, 2024).
[2] *Id.*
[3] Notice of Data Security Incident, available at https://affinityhealthservices.net/wp-content/uploads/2023/12/Revised-Substitute-Notice-%E2%80%93-Affinity.pdf (attached as **Exhibit A**).
[4] *Id.*

7.     Sometime on or around November 11, 2023, AHS posted a statement on its website acknowledging the Data Breach and stating that "Upon discovering the incident, third-party forensic specialists were engaged to assist with securing the environment and investigating the extent of the unauthorized activity." **Ex. A**.

8.     Upon information and belief, victims of the Data Breach did not start receiving letters notifying them of the Data Breach until December 18, 2023. *See, Notice of Data Security Incident* addressed to Plaintiff Jennifer Turner (Hall), dated Dec. 18, 2023, attached as **Exhibit B.**

9.     AHS's failure to protect patients' and employees' Personal Information and failure to adequately notify or warn them about the Data Breach violates Pennsylvania and California law, harming thousands of current and former AHS patients and employees and their family members.

10.    AHS's failure to timely inform victims of the Data Breach has made its patients and employees vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their Personal Information.

11.    Despite the seriousness of the Data Breach and the importance of the compromised Personal Information, AHS failed to provide adequate and timely notice of the incident to each victim of the Data Breach.

12.    Despite representing to victims of the Data Breach that "[AHS] found no evidence that patient information has been specifically misused," "[i]n order to address any concerns and mitigate any exposure or risk of harm following this

incident," AHS arranged for complimentary credit monitoring and identity theft protection services to all potentially impacted individuals at no cost to them for a period of twelve months. **Ex. A.**

13.    AHS knew that each victim of the Data Breach was owed prompt and efficient notice of the Data Breach and assistance in mitigating the effects of Personal Information misuse.  AHS acknowledges its duty to provide timely and adequate notice of a data breach in its Notice of Privacy Practices.

14.    Plaintiff and members of the proposed Class are victims of Defendant's inadequate cyber security measures. Specifically, Plaintiff and members of the proposed Class trusted Defendant with their Personal Information. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach. When the Data Breach was finally discovered, Defendant failed to provide adequate or timely notice to the Data Breach victims, underscoring its out-of-date security practices and procedures.

15.    Defendant's inadequate response to the Data Breach caused real and substantial damage to Plaintiff and members of the proposed Class.

16.    Plaintiff and members of the proposed Class therefore bring this lawsuit seeking damages and restitution for Defendant's actions.

## THE PARTIES

17.    Plaintiff Jennifer Turner is a natural person and citizen of California, residing in Tulare, California. Plaintiff's Personal Information was compromised by the Data Breach.

18.    Defendant Affinity Health Services, LLC is a Delaware corporation with its principal place of business and Registered Agent located at 942 Philadelphia Street, Indiana, Pennsylvania, 15701.  AHS is thus a citizen of Pennsylvania.

## JURISDICTION AND VENUE

19.    This Court has personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State; it maintains its principal place of business and headquarters in Pennsylvania; and committed tortious acts in Pennsylvania.

20.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred (100) members in the proposed Class, and at least one member of the class is a citizen of a state different from Defendant.

21.    The Court has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367.

22.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## COMMON FACTUAL ALLEGATIONs

**A.    AHS's Failure to Prevent the Data Breach**

23.    AHS is a private company that provides management and consulting

services for senior living providers.[5]    Affinity Health Services also conducts restorative nursing, pain management, and dementia and palliative care programs. "The company specializes in data collection, coaching supervision, nursing documentation assessment, and recruitment and retention strategy planning services."[6]

24.    AHS provides "administration services for senior living communities including facility-level staff hiring as well as corporate- and in-house training services for management and other members."[7]

25.    Plaintiff and members of the proposed Class are current and former patients, employees, and affiliates of patients and employees of senior living communities for which AHS contracted to provide management services.

26.    As a prerequisite of receiving treatment, AHS requires its patients to provide their PII and PHI.

27.    As a prerequisite of employment, AHS requires its employees to provide their PII.

28.    AHS maintains records of its patients' and employees' information such as their full names, Social Security Numbers, financial account information, credit-card information, dates of birth, prescription information, diagnosis information, treatment information, treatment providers, health insurance information, medical

---

[5] See Affinity Health Services Senior Community Management and Consulting Services Brochure, available at https://affinityhealthservices.net/wp-content/uploads/2021/10/Affinity-Brochure.pdf (last accseed Mar. 21, 20240.
[6] https://affinityhealthservices.net/about-us/ (last acc. Mar. 21, 2024).
[7] Id.

information, and Medicare/Medicaid ID numbers, in the ordinary course of business. These records are stored on AHS's network systems.

29.     AHS informs its patients and employees that it is required by law to protect the privacy of their PHI in its *HIPAA Notice of Privacy Practices* ("Privacy Notice").[8] The Privacy Notice is attached hereto as **Exhibit C.**

30.     The Privacy Notice states that AHS is "required to abide by the terms of [the Privacy Notice]" and describes how AHS "may use and disclose [patient and employee] Protected Health Information (PHI) to carry out treatment, payment, or health care operations and for other purposes that are permitted or required by law." *Id.*

31.     The Privacy Notice defines PHI as "information about you, including demographic information, that may identify you and that relates to your past, present or future physical or mental health or condition and related health care services." *Id.*

32.     AHS represented to its patients and employees that their Personal Information would be secure.

33.     AHS's Privacy Notice acknowledges its duty to promptly notify victims of a Data Breach.  AHS makes the following representations regarding its duties following a Data Breach:

**5. Our Duty to Notify in the Event of a Breach**

We are required to notify you in the event that your unsecured PHI is breached. A "breach" is defined as the unauthorized acquisition, access,

---

[8] *See HIPAA Notice of Privacy Practices,* available at https://affinityhealthservices.net/wp-content/uploads/2021/04/Website-HIPAA-NOTICE-OF-PRIVACY-PRACTICES-09-01-2013-reviewed-7-2017.pdf (last accessed Mar. 21, 2024).

use, or disclosure of PHI which compromises the security or privacy of the PHI, but does not include unintentional acquisition, access or use of such information, inadvertent disclosure of such information within a facility, and disclosure to a person not reasonably able to retain it. "Unsecured protected health information" refers to PHI that is not secured through the use of a valid encryption process approved by the Secretary of Health and Human Services or the destruction of the media on which the PHI is recorded or stored. Should any of your "unsecured" PHI held by us be "breached," then we will fully comply with the HIPAA/HITECH breach notification requirements and we will notify you as follows:

a. **Timing and Method of Notification.** We will notify you no later than calendar 60 days after discovery of such breach via first-class mail or e-mail, if specified by you as your preference. If the breach involves the information of more than 500 individuals, we will also provide notice to prominent media outlets. We will also notify the Secretary of Health and Human Services of the breach (immediately if the breach involves the

b. **Contents of Notification.** Our notification to you will include:

1. A brief description of what happened, including the date of breach and date of discovery (if known).

2. A description of the types of unsecured PHI that were involved in the breach (such as whether full name, social security number, date of birth, home address, account number, diagnosis, disability code, or other types of information were involved).

3. Any steps you should take to protect yourself from potential harm resulting from the breach.

4. A brief description of what we are doing to investigate the breach, mitigate harm to the individuals whose PHI was breached, and protect against further breaches; and

5. Contact procedures for you to ask questions or learn additional information, which will include a toll-free telephone number, an e-mail address, Web site, or postal address.

**Ex. C.**

34.     Plaintiff and members of the proposed Class relied on the representation that AHS would protect patients' information in accordance with state and federal law. *Id.*

35.     Despite AHS's duty to provide adequate and timely notice, as acknowledged in writing by AHS, AHS failed to provide timely or adequate notice of the Data Breach.  While AHS indicated that a "network security incident occurred" on or about April 24, 2023,[9] AHS waited until at least November 11, 2023, over six months after the Data Breach, to notify affected individuals.

36.     According to The Notice published on its website, the following information was acquired and disclosed by an unauthorized third party: first name, last name, address, date of birth, Social Security number, driver license's number, medical record number, patient ID number, Medicare/Medicaid number, health insurance information, financial account information or credit and debit card numbers, and certain health information.[10]  **Ex. A.**

37.     In response to the Data Breach, AHS stated it took the following action:

> Upon detecting this incident we moved quickly to initiate a response, which included conducting an investigation with the assistance of IT specialists and confirming the security of our network environment. We have made immediate enhancements to our systems, security and practices. Additionally, we have engaged appropriate experts to assist us in conducting a full review of our security practices and systems to ensure that enhanced security protocols are in place going forward. We are committed to helping those people who may have been impacted by this unfortunate situation.

---

[9] See Ex. A.

[10] *Id.*

**Ex. A.**

38.    AHS's disclosures on its website of the Data Breach did not indicate the number of individuals affected by the breach, however, upon information and belief, the Data Breach has impacted thousands of AHS patients, employees, and affiliates of patients and employees.

39.    Upon information and belief, AHS failed to adequately train its employees on even the basic cybersecurity protocols, including:

      a) Effective password management and encryption protocols, including, but not limited to, the use of Multi-Factor Authentication for all users;

      b) Locking, encrypting, and limiting access to computers and files containing sensitive information;

      c) Implementing guidelines for maintaining and communicating sensitive data;

      d) Protecting sensitive patient information, including personal and financial information, by implementing protocols on how to request and respond to requests for the transfer of such information and how to securely send such information through a secure file transfer system to only known recipients; and

      e) Providing focused cybersecurity awareness training programs for employees.

40.     AHS's negligent conduct caused the Data Breach. AHS violated its obligation to implement best practices and comply with industry standards concerning computer system security. AHS failed to comply with security standards and allowed its patients' and employees' Personal Information to be accessed and stolen by failing to implement security measures that could have prevented, mitigated, or detected the Data Breach.

41.     AHS ultimately admitted to the Data Breach on or about November 2023.

42.     Upon information and belief, AHS notified victims of the Data Breach that their Personal Information was accessed in the breach via notice letters.

43.     AHS encouraged Data Breach victims to "remain vigilant in reviewing your financial account statements, explanation of benefits statements, and credit reports for fraudulent or irregular activity on a regular basis." **Ex. B.**

44.     AHS also encouraged victims to sign up for twelve months of complimentary credit monitoring and place fraud alerts with the three credit bureaus "[o]ut of an abundance of caution and to protect [them] from potential misuse of [their] information." **Ex. B**.

**B.     Plaintiff and the Proposed Class Face Significant Risk of Identity Theft**

45.     Plaintiff and members of the proposed Class have suffered injury from the misuse of their Personal Information that can be directly traced to Defendant.

46.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's Personal Information secure are severe. Identity theft occurs when someone

11

uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

47.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.[11]

48.    As a result of AHS's failures to prevent—and to timely detect—the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

      a) The loss of the opportunity to control how their Personal Information is used;

      b) The diminution in value of their Personal Information;

      c) The compromise and continuing publication of their Personal Information;

      d) Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

      e) Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to

---

[11] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, ThreatPost.com (Feb. 21, 2013), https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/ (last visited May 3, 2022).

mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f)  Delay in receipt of tax refund monies;

g)  Unauthorized use of stolen Personal Information; and

h)  The continued risk to their Personal Information, which remains in the possession of AHS and is subject to further breaches so long as AHS fails to undertake the appropriate measures to protect the Personal Information in their possession.

49.  Stolen Personal Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Personal Information can be worth up to $1,000.00 depending on the type of information obtained.[12]

50.  The value of Plaintiff's and the proposed Class's Personal Information on the black market is considerable. Stolen Personal Information trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

---

[12] *See* Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited April 18, 2022).

51. It can take victims years to spot identity or Personal Information theft, giving criminals plenty of time to milk that information for cash.

52. One such example of criminals using Personal Information for profit is the development of "Fullz" packages. [13]

53. Cyber-criminals can cross-reference two sources of Personal Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

54. The development of "Fullz" packages means that stolen Personal Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Personal Information stolen by the cyber-criminals in the Data Breach, criminals can

---

[13] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY, (Sep. 18, 2014), *available at* https://krebsonsecurity.com/tag/fullz/, (last visited May 3, 2022).

easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen Personal Information is being misused, and that such misuse is fairly traceable to the Data Breach.

55.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

56.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did not rapidly report to Plaintiff and the Class that their Personal Information had been stolen.

57.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

58.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend considerable time repairing the damage caused by the theft of their Personal Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor

their reports for future inaccuracies, close existing bank/credit accounts, open new

ones, and dispute charges with creditors.

59.    Further complicating the issues faced by victims of identity theft, data

thieves may wait years before attempting to use the stolen Personal Information. To

protect themselves, Plaintiff and the Class will need to remain vigilant against

unauthorized data use for years or even decades to come.

60.    The Federal Trade Commission ("FTC") has also recognized that

consumer data is a new and valuable form of currency. In an FTC roundtable

presentation, former Commissioner Pamela Jones Harbour stated that "most

consumers cannot begin to comprehend the types and amount of information collected

by businesses, or why their information may be commercially valuable. Data is

currency."[14]

61.    The FTC has also issued numerous guidelines for businesses that

highlight the importance of reasonable data security practices. The FTC has noted

the need to factor data security into all business decision-making.[15] According to the

FTC, data security requires: (1) encrypting information stored on computer networks;

(2) retaining payment card information only as long as necessary; (3) properly

disposing of personal information that is no longer needed; (4) limiting administrative

---

[14] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before
FTC Exploring Privacy Roundtable, (Dec. 7, 2009),
http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited May
3, 2022).
[15] *Start With Security, A Guide for Business*, FTC,
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-
startwithsecurity.pdf (last visited May 3, 2022).

access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[16]

62.    According to the FTC, unauthorized Personal Information disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money, and patience to resolve the fallout.[17] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

63.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ¶ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks

---

[16] *Id.*

[17] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), https://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited Jan. 18, 2022).

and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . .."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. AHS thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of Personal Information.

64.    AHS disclosed the Personal Information of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, AHS opened up, disclosed, and exposed the Personal Information of Plaintiff and members of the proposed Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (*i.e.*, identity fraud), all using the stolen Personal Information.

65.    AHS's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard

for privacy, and has exposed the Personal Information of Plaintiff and thousands of members of the proposed Class to unscrupulous operators, con artists and outright criminals.

66.    AHS's failure to properly and promptly notify Plaintiff and members of the proposed Class of the Data Breach exacerbated Plaintiff's and members of the proposed Class's injury by depriving them of the earliest ability to take appropriate measures to protect their Personal Information and take other necessary steps in an effort to mitigate the harm caused by the Data Breach.

67.    Upon information and belief, AHS knew the severity of the Data Breach but chose to downplay the Data Breach's impact. In its Breach Notice, AHS states that it has "no evidence that [patients'] personal information [were] used for fraudulent purposes," but then proceeded to contact "law enforcement" for assistance and guidance. **Ex. A.**

68.    In the same notice, AHS also acknowledged that its systems, policies, and procedures were not adequate at the time of the Data Breach, thus subjecting patients' Personal Information to exposure by an unauthorized party. *Id.*

69.    As a result, whether or not AHS had immediate evidence of misuse of the accessed Personal Information, the Data Breach resulted in at least one unauthorized user viewing and accessing patients' and employees' Personal Information and thus it was, for all practical purposes, stolen and misused.

## PLAINTIFF'S EXPERIENCE

70.    Plaintiff Jennifer Turner does not know how she is affiliated with AHS.

The Notice Letter addressed to Plaintiff indicates that she is either a current or former employee, patient, or affiliate of an employee or patient of Communities at Indian Haven, a senior living community AHS manages.

71.     As a condition of providing services to Ms. Turner or her family members, AHS required Ms. Turner to provide her Personal Information.

72.     Ms. Turner provided AHS with her Personal Information as a condition of receiving services from AHS. Ms. Turner would not have provided her Personal Information to AHS had she known that AHS would not protect it as promised.

73.     On or around January 2024, Ms. Turner received a notice from AHS and became aware that her Personal Information was impacted by the Data Breach.

74.     In the months following the Data Breach, Ms. Turner experienced fraudulent activity in her bank account.  Specifically, in February 2024, Ms. Turner's Capital One account was accessed by hackers.   There were several attempted unauthorized charges on her Capitol One account.

75.     As a result, Capital One closed both of Ms. Turner's credit cards related to Capital One.  Ms. Turner spent a considerable amount of time disputing the unauthorized charges and sorting out the fraud with Capital One, including at least seven (7) hours on the phone with Capital One.  Ms. Turner also had to take time off from work to deal with the fraud.  Upon information and belief, this fraudulent activity is a direct result of the Data Breach.

76.     As a further result of the Data Breach, in the months following the Data Breach, Ms. Turner expended considerable time and effort monitoring her accounts,

changing passwords, and ordering all new credit cards to protect herself from identity theft. Ms. Turner fears for her personal financial security and is experiencing feelings of rage and anger, anxiety, sleep disruption, stress, fear, and physical pain. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

77.    Ms. Turner has experienced an increase in the number of spam calls and text messages she receives following the Data Breach.

78.    Ms. Turner remains at a continued risk of harm due to the exposure and potential misuse of her personal data by criminal hackers.

## CLASS ALLEGATIONS

79.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

80.    Plaintiff brings this nationwide class action individually and on behalf of all other persons similarly situated ("the Nationwide Class") pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, and Fed. R. Civ. P. 23(b)(3).

81.    Plaintiff proposes the following Class definition(s), subject to amendment based on information obtained through discovery:

**<u>Nationwide Class:</u>**

**All persons whose Personal Information was compromised as a result of the Data Breach experienced by Defendant on or around April 24, 2023, as announced by AHS, including all persons who received the Breach Notice.**

In addition, or in the alternative, Plaintiff proposes the following state class

("California Class") (together with the Nationwide Class, the "Class"):

**California Class:**

**All persons residing in California whose Personal Information was compromised as a result of the Data Breach experienced by Defendant on or around April 24, 2023, as announced by AHS, including all persons who received the Breach Notice.**

Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

82.    Plaintiff reserves the right to amend the definition of the Class or add a class or subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

83.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of Class Members' claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims for each Class Member.

84.    This action satisfies the requirements for a class action under Fed. R. Civ. P. 23(a)(1)-(3) and Fed. R. Civ. P. 23(b)(2), including requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority.

85.    **Numerosity, Fed. R. Civ. P. 23(a)(1):** The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief,

the Personal Information of thousands current and former employees and patients of Defendant was compromised in the Data Breach. Such information is readily ascertainable from Defendant's records.

86.    **Commonality, Fed. R. Civ. P. 23(a)(2):** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

   a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII;

   b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

   c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, the FTC Act;

   d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

   e.    Whether computer hackers obtained Class Members' PII in the Data Breach;

   f.    Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

   g.    Whether Plaintiff and the Class Members suffered legally

cognizable damages as a result of Defendant's misconduct;

h.  Whether Defendant breached the covenant of good faith and fair dealing implied in its contracts with Plaintiff and Class Members;

i.  Whether Defendant's acts violated Pennsylvania or California law, and;

j.  Whether Plaintiff and the Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

87.  **Typicality, Fed. R. Civ. P. 23(a)(3):** The claims or defenses of Plaintiff are typical of the claims or defenses of the proposed Class because Plaintiff's claims are based upon the same legal theories and same violations of law.  Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach.

88.  **Adequacy, Fed. R. Civ. P. 23(a)(4):** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

89.  **Predominance, Fed. R. Civ. P. 23(b)(3):** Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data—PII—was stored on the same computer systems and unlawfully exposed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has

important and desirable advantages of judicial economy.

90.    **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is a superior method for the fair and efficient adjudication of this controversy because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, and joinder of the Class Members is otherwise impracticable. Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation for many reasons, including the following:

a.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions. Many members of the Class are not in the position to incur the expense and hardship of retaining their own counsel to prosecute individual actions, which in any event might cause inconsistent results.

b.    When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class. This will promote global relief and judicial efficiency in that the liability of Defendant to all Class Members, in terms of money damages due and in terms of equitable relief, can be determined in this single proceeding rather than in multiple, individual proceedings where there will be a risk of inconsistent and varying results.

c.    A class action will permit an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions. If Class Members are forced to bring individual suits, the transactional costs, including those incurred by Defendant, will increase dramatically, and the courts will be clogged with a multiplicity of lawsuits concerning the very same subject matter, with identical fact patterns and the same legal issues. A class action will promote a global resolution and will promote uniformity of relief as to the Class Members and as to Defendant.

d.    This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes only AHS's patients and employees, the legal and factual issues are narrow and easily defined, and the Class membership is limited. The Class does not contain so many persons that would make the Class notice procedures unworkable or overly expensive. The identity of the Class Members can be identified from Defendant's records, such that direct notice to the Class Members would be appropriate.

91.    In addition, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding

declaratory relief are appropriate on a class-wide basis.

92.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.     Whether Defendant failed to timely and adequately notify the public of the Data Breach;

b.     Whether AHS owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.     Whether AHS's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d.     Whether AHS's failure to institute adequate protective security measures amounted to negligence;

e.     Whether AHS failed to take commercially reasonable steps to safeguard patient and employee PII; and

f.     Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

93.     Finally, all members of the proposed Class are readily ascertainable. AHS has access to Class Members' names and addresses affected by the Data Breach.

Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

94.    Plaintiff re-alleges and incorporate by reference all paragraphs above as if fully set forth herein.

95.    Defendant required Plaintiff and the Class Members to submit private, confidential Personal Information to it, as a condition of receiving medical care and/or as a condition of employment.

96.    Plaintiff and the Class Members are individuals who provided certain Personal Information to Defendant including Social Security numbers, dates of birth, driver's license numbers and/or state identification numbers, passports, direct deposit bank information, medical information and health insurance information.

97.    Defendant had full knowledge of the sensitivity of the Personal Information to which it was entrusted, and the types of harm that Plaintiff and the Class Members could and would suffer if the Personal Information was wrongfully disclosed to unauthorized persons. Defendant had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information.

98.    Plaintiff and the Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their data in Defendant's possession.

99.     By collecting and storing this data in its computer systems, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect if that Personal Information was exposed to the internet and to give prompt notice to those affected in the case of a data breach.

100.    Defendant owed a duty of care to Plaintiff and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Personal Information.

101.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients and employees, which is recognized by laws and regulations including but not limited to the FTC Act, as well as the common law. Defendant was able to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

102.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

103.    Defendant's duty to use reasonable care in protecting confidential data

and PII arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Personal Information.

104.    Defendant breached its duties, and was negligent, by acts of omission or commission, by failing to use reasonable measures to protect the Plaintiff's and Class Members' Personal Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Personal Information;

b. Failing to adequately train employees on proper cybersecurity protocols;

c. Failing to adequately monitor the security of its networks and systems;

d. Failure to periodically ensure that its network system had plans in place to maintain reasonable data security safeguards;

e. Allowing unauthorized access to Plaintiff's and Class Members' Personal Information;

f. Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

105.    It was foreseeable that Defendant's failure to use reasonable measures

to protect Plaintiff's and Class Members' Personal Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyber-attacks and data breaches in the industry.

106.   It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Personal Information would result in one or more types of injuries to them.

107.   As a direct and proximate result of Defendant's negligence set forth in the preceding paragraphs, Plaintiff and Class Members have suffered injury and damages as set forth herein, including monetary damages, fraudulent misuse of their Personal Information and fraudulent charges; loss of the opportunity to control how their Personal Information is used; diminution in value of their Personal Information; compromise and continuing publication of their Personal Information; and are entitled to compensatory, consequential, and incidental damages as a result of the Data Breach.

108.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

109.   Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

110.   Through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for employment and/or medical care, and that Defendant would deal with them fairly and in good faith, as well as implied contracts for the Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Personal Information entrusted to Defendant.

111.   Specifically, Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendant when they first applied for employment and/or received Defendant's medical care.

112.   The valid and enforceable implied contracts that Plaintiff and Class Members entered into with Defendant included Defendant's promise to protect nonpublic Personal Information given to Defendant, or that Defendant created on its own, from unauthorized disclosures. Plaintiff and Class Members provided this Personal Information in reliance of that promise.

113.   Defendant solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

114.   In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act.

115.    Plaintiff and Class Members who paid money to Defendant for medical care in the form of interest and fees, or who provided labor in exchange for employment, and who provided their PII to Defendant, reasonably believed and expected that Defendant would adequately employ adequate data security to protect that PII. Defendant failed to do so.

116.    Under the implied contracts, Defendant promised and was obligated to: (a) provide medical care or employment to Plaintiff and Class Members; and (b) protect Plaintiff's and the Class Members' PII: (i) provided to obtain such services and/or (ii) created in connection therewith. In exchange, Plaintiff and Class Members agreed to pay money for these services or to provide labor, and to turn over their PII.

117.    The provision of medical care and/or employment and the protection of Plaintiff's and Class Members' PII, were material aspects of these implied contracts.

118.    The implied contracts for the rendering of medical care and/or employment—contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Class Members' PII—are also acknowledged, memorialized, and embodied in multiple documents, including Defendant's Privacy Notice as described in the preceding paragraphs.

119.    Defendant's representations, including, but not limited to those found in its Privacy Notice, described in the preceding paragraphs, memorialize and embody an implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII.

120.    Plaintiff and the Class Members as patients and employees of Defendant

value their privacy, the privacy of their dependents, and the ability to keep their PII private. To patients and employees such as Plaintiff and the Class Members, Defendant's practices that do not adhere to industry-standard data security protocols to protect PII render the medical care fundamentally less useful and less valuable than those which adhere to industry-standard data security.

121.   Plaintiff and Class Members would not have entrusted their PII to Defendant and entered into these implied contracts with Defendant without an understanding that their PII would be safeguarded and protected, or entrusted their PII to Defendant, directly or indirectly, in the absence of its implied promise to monitor its computer systems and networks to ensure that PII was not disclosed to unauthorized parties and exposed to the public as occurred in the Data Breach.

122.   A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their PII to Defendant and paid for medical care for, amongst other things, (a) the provision of such services and (b) the protection of their PII.

123.   Plaintiff and the Class Members performed their obligations under the contracts when they paid for medical care in the form of fees and interest and provided their PII to Defendant.

124.   Defendant materially breached its contractual obligations to protect the nonpublic PII of Plaintiff and the Class Members which Defendant required and gathered when the information was unauthorized disclosed in the Data Breach.

125.   Defendant materially breached its contractual obligations to deal fairly

and in good faith with Plaintiff and the Class Members when it failed to take adequate precautions to prevent the Data Breach and failed to promptly notify them of the Data Breach.

126.    Defendant materially breached the terms of its implied contracts, including, but not limited to, the terms stated in the relevant Privacy Notice. Defendant did not maintain the privacy of Plaintiff's and the Class Members' PII. Specifically, Defendant did not comply with industry standards, the standards of conduct embodied in statutes like Section 5 of the FTC Act, or otherwise protect Plaintiff's and the Class Members' PII, as set forth above.

127.    The Data Breach was a reasonably foreseeable consequence of Defendant's conduct, by acts of omission or commission, in breach of these contracts.

128.    As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received medical care or wages that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for or agreed to and that which they received.

129.    Implicit in the parties' agreements was that Defendant would adequately safeguard the Personal Information entrusted to it and would provide Plaintiff and members of the Class with prompt and adequate notice of all unauthorized access to and/or theft of their Personal Information.

130.    Plaintiff and the members of the Class would not have entrusted their Personal Information to Defendant in the absence of such agreements with Defendant.

131.    As a direct and proximate result of the Data Breach, Plaintiff and the Class Members have suffered injury and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they had struck with Defendant.

132.    Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

133.    Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT III
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

134.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

135.    This claim is pleaded in the alternative to the claim of breach of implied contract (Count II).

136.    Plaintiff and members of the Class conferred benefits upon Defendant in the form of either 1) payment for medical care or 2) labor.  Also, Defendant received

additional benefits from receiving the PII of Plaintiff and members of the Class—such data is used to facilitate employment and the payment and the provision of medical services.

137.    Defendant appreciated or knew of these benefits that it received. And under principles of equity and good conscience, this court should not allow Defendant to retain the full value of these benefits—specifically, the payments and PII of Plaintiff and members of the Class or the value of the labor received with insufficient data protections.

138.    After all, Defendant failed to adequately protect Plaintiff's and Class Members' PII. And if such inadequacies were known, then Plaintiff and the members of the Class would never have conferred payment to Defendant, provided labor to Defendant, nor disclosed their PII.

139.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and members of the Class—all funds that were unlawfully or inequitably gained despite Defendant's misconduct and the resulting Data Breach.

## COUNT IV
## BREACH OF CONFIDENCE
### (On Behalf of Plaintiff and the Class)

140.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

141.    At all times during Plaintiff's and Class Members' interactions with Defendant and/or its agents, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' PII.

142.    Defendant's relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized parties.

143.    Plaintiff and Class Members provided their PII to Defendant and/or its agents with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized parties.

144.    Plaintiff and Class Members also provided their PII to Defendant and/or its agents with the explicit and implicit understandings that Defendant would take precautions to protect such PII from unauthorized disclosure.

145.    Defendant voluntarily received in confidence Plaintiff's and Class Members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

146.    Due to Defendant's failure to prevent, detect, or avoid the Data Breach from occurring by, inter alia, following industry standard information security practices to secure Plaintiff's and Class Members' PII, Plaintiff's and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

147.    As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff and Class Members have suffered damages.

148.    But for Defendant's disclosure of Plaintiff's and Class Members' PII in violation of the parties' understanding of confidence, their protected PII would not

have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' protected PII, as well as the resulting damages.

149.    The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff' and Class Members' PII.

150.    As a direct and proximate result of Defendant's breach of confidence, Plaintiff and Class Members have suffered and will suffer injury and damages as set forth herein, including monetary damages, fraudulent misuse of their PII and fraudulent charges; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to compensatory, consequential, and incidental damages as a result of the Data Breach.

151.    As a direct and proximate result of Defendant's breach of confidence, Plaintiff and Class Members have suffered and will continue to suffer injury and/or harm.

**COUNT V**
**INVASION OF PRIVACY—INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiff and the Class)**

152.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

153.    Plaintiff and the Class had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to

unauthorized third parties.

154.    Defendant owed a duty to its current and former patients and employees, including Plaintiff and the Class Members, to keep their PII confidential.

155.    Defendant failed to protect said PII and exposed the PII of Plaintiff and the Class Members to unauthorized persons which is now publicly available, including on the dark web, and being fraudulently misused.

156.    Defendant allowed unauthorized third parties access to and examination of the PII of Plaintiff and the Class Members, by way of Defendant's failure to protect the PII.

157.    The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and the Class Members is highly offensive to a reasonable person.

158.    The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and the Class Members disclosed their PII to Defendant as a condition of receiving medical care or as a condition of employment, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and the Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

159.    The Data Breach constitutes an intentional or reckless interference by Defendant with Plaintiff's and the Class Members' interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that

would be highly offensive to a reasonable person.

160.    Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because they had actual knowledge that its information security practices were inadequate and insufficient.

161.    Defendant acted with reckless disregard for Plaintiff's and Class Members' privacy when they allowed improper access to its systems containing Plaintiff's and Class Members' PII.

162.    Defendant was aware of the potential of a data breach and failed to adequately safeguard their systems and implement appropriate policies to prevent the unauthorized release of Plaintiff's and Class Members' PII.

163.    Because Defendant acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and the Class Members.

164.    As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiff and the Class Members was disclosed to third parties without authorization, causing Plaintiff and the Class Members to suffer injury and damages as set forth herein, including  monetary damages, fraudulent misuse of their PII and fraudulent charges; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to compensatory, consequential, and incidental damages as a result of the Data Breach.

165.    Unless and until enjoined, and restrained by order of this Court,

Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class Members.

**COUNT VI**
**BAILMENT**
**(On Behalf of Plaintiff and the Class)**

166.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

167.    Plaintiff, the Class Members, and Defendant contemplated a mutual benefit bailment when the Plaintiff and putative members of the Class transmitted their PII to Defendant solely for the purpose of obtaining medical care or employment.

168.    Plaintiff and the Class entrusted their PII to Defendant for a specific purpose—to obtain medical care or employment—with an implied contract that the trust was to be faithfully executed, and the PII was to be accounted for when the special purpose was accomplished.

169.    Defendant accepted the Plaintiff's and the Class's PII for the specific purpose of providing employment or medical care.

170.    Defendant was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiff's and the Class's PII.

171.    Plaintiff and the Class's PII was used for a different purpose than the

Plaintiff and the Class intended, for a longer time period and/or in a different manner or place than Plaintiff and the Class intended.

172.    As set forth in the preceding paragraphs, Plaintiff and the Class Members were damaged thereby.

## COUNT VII
### Violation of the California Consumer Privacy Act
### Cal. Civ. Code § 1798.150
### (On Behalf of Plaintiff and the California Subclass)

173.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

174.    Defendant violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted Personal Information of Plaintiff and the California Subclass. As a direct and proximate result, Plaintiff's, and the California Subclass's nonencrypted and nonredacted Personal Information was subject to unauthorized access and exfiltration, theft, or disclosure.

175.    Defendant is a business organized for the profit and financial benefit of its owners according to California Civil Code § 1798.140, that collects the personal information of its customers, and whose annual gross revenues exceed the threshold established by California Civil Code § 1798.140(d).

176.    Plaintiff and California Subclass Members seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards Personal Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold Personal

43

Information, including Plaintiff's and California Subclass members' Personal Information. Plaintiff and California Subclass members have an interest in ensuring that their Personal Information is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

177.    Pursuant to California Civil Code § 1798.150(b), on or around March 21, 2024, Plaintiff mailed a CCPA notice letter to Defendant's registered service agents, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate.

178.    Accordingly, because no cure is possible under these facts and circumstances—Plaintiff intends to seek statutory damages of between $100 and $750, in addition to all other relief afforded by the CCPA.

**COUNT VIII**
**Violation of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

179.    Plaintiff realleges and incorporates by reference the above allegations as if fully set forth herein.

180.    In Section 56.10(a) of the California Civil Code provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization[.]"

181.    Defendant is a "contractor" within the meaning of Civil Code § 56.05(d) within the meaning of Civil Code § 56.06 and/or a "business organized for the purpose of maintaining medical information" and/or a "business that offers software or

hardware to consumers . . . that is designed to maintain medical information" within the meaning of Civil Code § 56.06(a) and (b), and maintained and continues to maintain "medical information," within the meaning of Civil Code § 56.05(j), for "patients" of Defendant, within the meaning of Civil Code § 56.05(k).

182.    Plaintiff and California subclass members are "patients" within the meaning of Civil Code § 56.05(k) and are "endanger[ed]" within the meaning of Civil Code § 56.05(e) because Plaintiff and California subclass members fear that disclosure of their medical information could subject them to harassment or abuse.

183.    Plaintiff and California subclass members, as patients, had their individually identifiable "medical information," within the meaning of Civil Code § 56.05(j), created, maintained, preserved, and stored on Defendant's computer network at the time of the unauthorized disclosure.

184.    Defendant, through inadequate security, allowed unauthorized third-party access to Plaintiff's and California subclass members' medical information, without the prior written authorization of Plaintiff and California subclass members, as required by Civil Code § 56.10 of the CMIA.

185.    Defendant violated Civil Code § 56.101 of the CMIA through its willful and knowing failure to maintain and preserve the confidentiality of the medical information of Plaintiff and the California subclass members. Defendant's conduct with respect to the disclosure of confidential PII and PHI was willful and knowing because Defendant designed and implemented the computer network and security practices that gave rise to the unlawful disclosure.

186.    In violation of Civil Code § 56.101(a), Defendant created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiff's and class members' medical information in a manner that failed to preserve and breached the confidentiality of the information contained therein. Plaintiff's and California subclass member' medical information was viewed by unauthorized individuals including but not limited to, the hackers, individuals who purchased the Private Information on the dark web, and others, as a direct and proximate result of Defendant's violation of Civil Code § 56.101(a). In violation of Civil Code § 56.101(a), Defendant negligently created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiff's and California subclass members' medical information. Plaintiff's and California subclass members' medical information was viewed by unauthorized individuals, as described above, as a direct and proximate result of Defendant's violation of Civil Code § 56.101(a).

187.    Plaintiff's and California subclass members' medical information that was the subject of the unauthorized disclosure included "electronic medical records" or "electronic health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

188.    In violation of Civil Code § 56.101(b)(1)(A), Defendant's electronic health record system or electronic medical record system failed to protect and preserve the integrity of electronic medical information. Plaintiff's and California subclass members' medical information was viewed by unauthorized individuals including but not limited to, the hackers, individuals who purchased the Private Information on the

dark web, and others, as a direct and proximate result of Defendant's violation of Civil Code § 56.101(b)(1)(A).

189.    Defendant violated Civil Code § 56.36 of the CMIA through its failure to maintain and preserve the confidentiality of the medical information of Plaintiff and the California subclass members.

190.    As a result of Defendant's above-described conduct, Plaintiff and California subclass members have suffered damages from the unauthorized disclosure and release of their individual identifiable "medical information" made unlawful by Civil Code §§ 56.10, 56.101, 56.36. 385. As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the unauthorized disclosure, and violation of the CMIA, Plaintiff and California subclass members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia, (i) an imminent, immediate and the continuing increased risk of identity theft, identity fraud and medical fraud-risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII and PHI, (iv) statutory damages under the California CMIA, (v) deprivation of the value of their PII and PHI, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

191.    Plaintiff, individually and for each member of the Class, seeks nominal

damages of one thousand dollars ($1,000) for each violation under Civil Code § 56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2), injunctive relief, as well as punitive damages of up to $3,000 per Plaintiff and each California subclass member, and attorneys' fees, litigation expenses and court costs, pursuant to Civil Code § 56.35.

**COUNT IX**
**Violation of the California Customer Records Act,**
**Cal. Civ. Code §§ 1798.80 *et seq.*,**
**(On Behalf of Plaintiff and the California Subclass)**

192.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

193.    Cal. Civ. Code § 1798.81.5 provides that "[i]t is the intent of the Legislature to ensure that personal information about California residents is protected. To that end, the purpose of this section is to encourage businesses that own, license, or maintain personal information about Californians to provide reasonable security for that information."

194.    Section 1798.81.5(b) further states that: "[a] business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

195.    Cal. Civ. Code § 1798.84(b) provides that [a]ny customer injured by a violation of this title may institute a civil action to recover damages." Section 1798.84(e) further provides that "[a]ny business that violates, proposes to violate, or

has violated this title may be enjoined."

196.    Plaintiff and members of the California subclass are "customers" within the meaning of Civ. Code § 1798.80(c) and 1798.84(b) because they are individuals who provided personal information to Defendant, directly and/or indirectly, for the purpose of obtaining a service from Defendant.

197.    The personal information of Plaintiff and the California subclass at issue in this lawsuit constitutes "personal information" under § 1798.81.5(d)(1) in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (i) Social security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

198.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the California subclass's

personal information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiff and the California subclass. Specifically, Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information of Plaintiff and the California subclass from unauthorized access, destruction, use, modification, or disclosure. Defendant further subjected Plaintiff's and the California subclass's nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

199.    As a direct and proximate result of Defendant's violation of its duty, the unauthorized access, destruction, use, modification, or disclosure of the personal information of Plaintiff and the California subclass included hackers' access to, removal, deletion, destruction, use, modification, disabling, disclosure and/or conversion of the personal information of Plaintiff and the California subclass by the ransomware attackers and/or additional unauthorized third parties to whom those cybercriminals sold and/or otherwise transmitted the information.

200.    As a direct and proximate result of Defendant's acts or omissions, Plaintiff and the California subclass were injured and lost money or property including, but not limited to, the loss of Plaintiff's and the subclass's legally protected

interest in the confidentiality and privacy of their personal information, nominal damages, and additional losses described above. Plaintiff seeks compensatory damages as well as injunctive relief pursuant to Cal. Civ. Code § 1798.84(b).

201.    Moreover, the California Customer Records Act further provides: "A person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82.

202.    Any person or business that is required to issue a security breach notification under the CRA must meet the following requirements under §1798.82(d):

> a) The name and contact information of the reporting person or business subject to this section;
>
> b) A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;
>
> c) If the information is possible to determine at the time the notice is provided, then any of the following:
>
>> 1. the date of the breach,
>>
>> 2. the estimated date of the breach, or
>>
>> 3. the date range within which the breach occurred. The notification shall also include the date of the notice;
>
> d) Whether notification was delayed as a result of a law

enforcement investigation, if that information is possible to determine at the time the notice is provided;

e) A general description of the breach incident, if that information is possible to determine at the time the notice is provided;

f) The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a social security number or a driver's license or California identification card number;

g) If the person or business providing the notification was the source of the breach, an offer to provide appropriate identity theft prevention and mitigation services, if any, shall be provided at no cost to the affected person for not less than 12 months along with all information necessary to take advantage of the offer to any person whose information was or may have been breached if the breach exposed or may have exposed personal information.

203.    Defendant failed to provide the legally compliant notice under § 1798.82(d) to Plaintiff and members of the California subclass. Defendant did not provide timely written notice of the data breach to all impacted individuals.  As a result, Defendant has violated § 1798.82 by not providing legally compliant and timely notice to all class members. Because not all members of the class were notified

of the breach in a timely manner, members could have taken action to protect their personal information, but were unable to do so because they were not timely notified of the breach.

204.    As a result of the violations of Cal. Civ. Code § 1798.82, Plaintiff and class members suffered incrementally increased damages separate and distinct from those simply caused by the breaches themselves.

205.    As a direct consequence of the actions as identified above, Plaintiff and class members incurred additional losses and suffered further harm to their privacy, including but not limited to economic loss, the loss of control over the use of their identity, increased stress, fear, and anxiety, harm to their constitutional right to privacy, lost time dedicated to the investigation of the breach and effort to cure any resulting harm, the need for future expenses and time dedicated to the recovery and protection of further loss, and privacy injuries associated with having their sensitive personal, financial, and payroll information disclosed, that they would not have otherwise incurred, and are entitled to recover compensatory damages according to proof pursuant to § 1798.84(b).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Jennifer Turner, individually and on behalf of all others similarly situated, prays for judgment as follows:

A.    Trial by jury pursuant to Fed. R. Civ. Proc. 38(b) on all claims so triable;

B.    An Order certifying this case as a class action on behalf of Plaintiff

and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

C.    Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and statutory damages, including pursuant to the CCPA, CMIA, CCRA and punitive damages, as allowed by law;

D.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

E.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

F.    Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

G.    Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the transmitted PII;

H.    Awarding attorneys' fees and costs, as allowed by law,

I.    Awarding prejudgment and post-judgment interest, as provided by law;

J.    Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and,

K.    Any and all such relief to which Plaintiff and the Class are entitled.

Date: March 22, 2024                    Respectfully submitted,

                        */s/ Larry Bendesky*
                        Larry Bendesky (LEB5134)
                        Patrick Howard (PA ID #88572)
                        **SALTZ, MONGELUZZI, &**
                        **BENDESKY,P.C**.
                        1650 Market Street, 52nd Floor

Philadelphia, PA 19103
Tel: (215) 496-8282
Fax: (215) 496-0999
lbendesky@smbb.com
phoward@smbb.com

Lynn A. Toops*
Amina A. Thomas*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
athomas@cohenandmalad.com

J. Gerard Stranch, IV *
Andrew E. Mize*
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Samuel J. Strauss*
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com

*Motion for *Pro Hac Vice* Admission forthcoming

**Counsel for Plaintiff and the Proposed Class**